**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZATONYA F. MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24-cv-2682 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| VILLAGE OF MATTESON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In August 2023, the Village of Matteson, Illinois, terminated plaintiff Zatonya F. McCoy's employment as Deputy Director of Community Development. *See* Pl. Am. Resp. to Def. Local Rule (LR) 56.1(a)(2) Stmt. of Material Facts ¶¶ 1, 17, 53, 57, 68, Dkt. No. 74 [hereinafter "Pl. Resp. to SMF"]. McCoy sued her former employer, asserting claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq. See* Am. Compl. 9–14, Dkt. No. 15. The amended complaint also brings claims under the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115/1 *et seq.* Am. Compl. 14–16.

McCoy contends that her termination marked the culmination of a campaign of retaliation for complaining to the Village's mayor that female department heads were paid substantially less than male department heads for comparable work. *See* Am. Compl. ¶¶ 34–38; Def. Resp. to Pl. LR 56.1 Stmt. of Material Facts ¶¶ 10–15, Dkt. No. 66 [hereinafter "Def. Resp. to SMF"] (partially disputed facts; undisputed that McCoy complained to the mayor, ¶ 15). McCoy and the Village have filed cross-motions for summary judgment. Dkt. Nos. 51, 56. For the reasons explained below, genuine factual disputes require a trial on all but one of plaintiff's claims.

## I. Summary Judgment Standard

### A. Rule 56

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once "a properly supported motion for summary judgment is made," the nonmoving party must "go beyond the pleadings," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment . . . ." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citing *Calumet River Fleeting, Inc. v. Int'l Union of Op'g Eng'rs, Local 150*, 824 F.3d 645, 647–48 (7th Cir. 2016)). Considering each cross-motion in turn, the court construes "all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *St. Augustine Sch. v. Underly*, 78 F.4th 349, 357 (7th Cir. 2023) (quoting *Markel Ins. Co. v. Rau,* 954 F.3d 1012, 1016 (7th Cir. 2020)); *see also Munoz v. Nucor Steel Kankakee, Inc.*, 44 F.4th 595 (7th Cir. 2022); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

Plaintiff has moved for summary judgment on all of her claims. Since she bears the burden of proof, she "must lay out the elements of the claim, cite the facts which [she] believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71*, 778 F.3d at 601 (citing *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 42 (7th Cir. 1992); other citation omitted). Defendant, by contrast, carries its initial summary judgment burden as to claims on which it does not bear the burden of proof "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325 (citation modified).

**B. Local Rule 56.1 and Objections**

To show that a fact cannot be or is genuinely disputed, a party may cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(c). As they are required to do, the parties have presented the summary judgment facts in LR 56.1 fact statements and responses. These fact statements and responses serve as the court's "roadmap" to the evidence; they "are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994); *accord Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015).

LR 56.1(a)(1)–(2) requires a party moving for summary judgment to file "a supporting memorandum of law that complies with LR 56.1(g)," as well as "a statement of material facts that complies with LR 56.1(d) and that attaches the cited evidentiary material." LR 56.1(a)(1)–(2). In response, the nonmoving party must file "a supporting memorandum of law that complies with LR 56.1(g)" and "a response to the [movant's] LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e) and that attaches any cited evidentiary material not attached to the LR 56.1(a)(2) statement." LR 56.1(b)(1)–(2). In addition, the nonmoving party may file "a statement of additional material facts that complies with LR 56.1(d) and that attaches any cited evidentiary material not attached to the LR 56.1(a)(2) statement or LR 56.1(b)(2) response." LR 56.1(b)(3).

Here, the parties raise dozens of objections and arguments in responding to each other's LR 56.1 fact statements. Specifically, they contend that a fact is irrelevant, is not material for summary judgment purposes, is not supported by the cited evidence, contains inadmissible hearsay, and is otherwise inadmissible. *See, e.g.*, Pl. Resp. to SMF ¶¶ 3, 8, 9–13, 18–23, 25–27, 29, 32, 34–37, 39–41, 43–49, 51–54, 56–57; Def. Resp. to SMF ¶¶ 8–11, 13–15, 25, 37, 47, 49, 55, 66, 69, 71.

The Seventh Circuit has "routinely upheld the district court's discretion in requiring parties to comply strictly with [LR 56.1's] requirements." *Costco Wholesale*, 807 F.3d at 259 (citing *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 630 (7th Cir. 2009)). The court determines that LR 56.1 should be enforced strictly in this case and therefore rules as follows.

"Consistent with its ordinary practice, this court will not consider improper arguments in the [LR] 56.1 statements." *Spiegel v. EngageTel Inc.*, 372 F. Supp. 3d 672, 677 (N.D. Ill. 2019) (Gottschall, J.) (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); other citation omitted). Also, the court "disregards legal conclusions" in the parties' LR 56.1 fact statements and responses. *Id.* (citing *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012); other citation omitted). Relevance and materiality arguments will be resolved below, to the extent necessary, as they arise. *Id.* (citing *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1019 (N.D. Ill. 2018)).

Furthermore, a party may not respond to a paragraph of a fact statement by citing to another fact statement; doing this "saves counsel time but offloads on the court the burden of identifying what is factually disputed and whether the dispute is material." *Rivera*, 319 F. Supp. 3d at 1019 (quoting *Schlessinger v. Chi. Hous. Auth.*, 130 F. Supp. 3d 1226, 1228 (N.D. Ill. 2015)). The court therefore disregards all cross-references in the parties' fact statements and responses. Regarding whether cited summary judgment material adequately supports the factual proposition for which it is cited, the court independently determines below whether the cited evidence supports each paragraph of the fact statements. *Spiegel*, 372 F. Supp. 3d at 677 (citing *Atkinson Candies*, 529 F.3d at 382 n.2; other citation omitted).

Putting aside improper arguments and cross-references in the fact statements, two evidentiary objections remain. First, the Village objects to ¶ 47 of McCoy's fact statement, which cites a purported transcript of a Zoom call between McCoy and Dewayne Howard, a Village human resources ("HR") employee. The Village contends that Howard did not consent to the recording of their Zoom call and argues, without citing legal authority, that the transcript is inadmissible. *See* Def. Resp. to SMF ¶ 47. The transcript reflects Howard's objection to

recording the call. *See* Pl. Ex. 27, at MCCOY 138–38, Dkt. No. 53-3. McCoy offers the transcript to support her federal claims, but she does not argue at summary judgment that it supports her state law claims under the IWPCA or IMWL. The Village's objection is therefore overruled as to the federal claims because "recorded conversations that violate state law are admissible in federal proceedings, at least in regard to federal claims, if the recordings comport with the federal requirement that one party consent" to the recording.[1] *Fenje v. Feld*, 301 F. Supp. 2d 781, 786 (N.D. Ill. 2003), *aff'd*, 398 F.3d 620 (7th Cir. 2005) (citing *United States v. D'Antoni*, 874 F.2d 1214, 1218–19 (7th Cir. 1989); other citations omitted). This ruling implies nothing about whether the recording violated state law.

The second objection is to hearsay. Paragraph 39 of the Village's fact statement recounts Howard's deposition testimony about what McCoy's doctor told him during a telephone conversation and describes correspondence Howard and the doctor exchanged on April 10 and 11, 2023. *See* Pl. Resp. to SMF ¶ 39. McCoy admits that the conversation and correspondence occurred but objects that Howard's testimony about "what the doctor told [him] [about McCoy's condition and limitations] is hearsay." *Id.* The doctor made the statements to Howard, who was not seeking diagnosis or treatment. The medical diagnosis exception therefore does not make Howard's testimony admissible to prove the doctor's assertions about McCoy's condition. *See* Fed. R. Evid. 803(4); *Hoglund v. Neal*, 959 F.3d 819, 834 (7th Cir. 2020); *Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1042–43 (7th Cir. 2020) (citing *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996)).

In *Youngman*, which was also an ADA accommodation case, the plaintiff testified that his doctor told him his condition could be exacerbated by certain stimuli. The Seventh Circuit held

[1] Two Zoom call transcripts in the summary judgment record indicate that "rev.com" prepared them. The record says nothing further about the transcription process, and neither transcript identifies a certified court reporter. The Village has not raised an authentication objection to either transcript. Summary judgment evidence need not be presented in a form admissible at trial if its content can be presented in admissible form. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (citing *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)). The court expresses no view on the form in which the transcripts could be admitted at trial.

that plaintiff's testimony could not establish the truth of the doctor's alleged statements about the plaintiff's diagnosis and limitations. *See Youngman*, 947 F.3d at 1042–43. Howard's account of the doctor's statements presents the same hearsay problem if offered for their truth.[2] The court sustains McCoy's objection to that use of Howard's testimony. McCoy does not object to considering the FMLA form the doctor sent the Village on April 11, 2023; she instead argues that the correspondence "speaks for itself." Pl. Resp. to SMF ¶ 39. The court therefore considers that correspondence at summary judgment.

## II. Summary Judgment Facts

Unless otherwise stated, the following facts are undisputed. The Village hired McCoy on August 24, 2020, as Deputy Director of Community Development, the position she held throughout her employment. Def. Resp. to SMF ¶¶ 1–2; *see also* Pl. Resp. to SMF ¶¶ 14–17 (explaining that McCoy interviewed for the director position). Her starting annual salary was $75,000. Def. Resp. to SMF ¶ 2. She did not receive a merit raise during her three years with the Village, although she received at least one cost-of-living adjustment. *See id.* ¶ 11.

McCoy was diagnosed with fibromyalgia in 1998. Pl. Resp. to SMF ¶ 19. Her symptoms include fatigue, brain fog, joint swelling, and difficulty driving during flare-ups. *See id.* As the Seventh Circuit has explained, "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1137 (7th Cir. 2017) (citation omitted). McCoy's fibromyalgia "flares up from time to time." Def. Resp. to SMF ¶ 31 (undisputed).

The Village had nine departments, including human resources and community development. *See* Pl. Resp. to SMF ¶ 7. Department heads reported to Anthony Burton, the

[2] An out-of-court statement offered only to show that the listener had notice of its contents does not qualify as hearsay. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 232 (7th Cir. 2021) (citing *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008)). The Village has not developed a separate notice-based argument concerning use of Howard's testimony about what the doctor said.

Village Administrator, who oversaw the Village's daily operations and reported to its president and board of trustees. *Id.* ¶¶ 6–7. McCoy reported to Ernest Roberts, the Director of Community Development; Roberts reported to Burton. Def. Resp. to SMF ¶¶ 7–8. Howard, whose title was "Human Resources Generalist," headed the Village's HR department and reported to Burton. Pl. Resp. to SMF ¶¶ 7, 9.

**A. McCoy's Job Duties**

The parties disagree about the amount of in-person work McCoy's duties required and, in particular, whether working from the office was an essential function of her job. The Village does not dispute the following description of her principal duties:

> Plaintiff's main duties included supervision of the Code Enforcement Officers, which involved occasional "ride-alongs," or site visits with her subordinates. It also involved spending a lot of time on the phone with the Code Enforcement Officers. [McCoy] was also in charge of a number of special projects, helped to grow the community development department budget, and was instrumental in improving staff morale. Her duties were mostly administrative.

Def. Resp. to SMF ¶ 18 (citation modified).

The record also contains a written description of the Deputy Director position. Def. Ex. 6, Dkt. No. 57-3; Pl. Ex. 16, Dkt. No. 53-2. The document bears a revision date of December 2020, three months after McCoy was hired. *See* Pl. Resp. to SMF ¶¶ 18, 22; Pl. Ex. 16. The Village points to duties and working conditions it describes that, in the Village's view, require fieldwork or presence in the office. These include, but are not limited to:

> "Manages and supervises operations of the Divisions of Building Services and Planning to achieve goals within available resources";
>
> "Resolves complex and sensitive customer service issues, either personally, by telephone or in writing";
>
> "Maintains harmony among workers and resolve [sic] grievances, performs or assists subordinates in performing duties";
>
> "Provides professional planning and development advice to supervisors and other officials; makes private and public presentations to supervisors, boards, commissions, civic groups and the general public";

> "Responds to local citizens inquiring about community development, planning and zoning regulations and ordinances";
>
> "Oversee [sic] work of engineering consultants";
>
> "Oversees the enforcement of a variety of codes and ordinances; and the issuances of correction notices and citations";
>
> "Review [sic] building and sign permit applications for compliance with the Zoning Ordinance, issue zoning certificates";
>
> "Assists Village staff in the enforcement of local ordinances and in interpreting Village codes and master plans"; and
>
> "Work is performed mostly in office settings. Some outdoor work is required in the inspection of various land use developments and construction sites."

Def. Resp. to SMF ¶ 19. The Village also relies on documents created in 2022 concerning the position's essential functions. Those documents and evidence about their creation are described below in Part II.B.

**B. Compensation Concerns and Development Plan**

During each fiscal year of her employment, Roberts requested a merit raise for McCoy, but she received none. *See* Def. Resp. to SMF ¶ 8. McCoy observed what she believed were disparities between the pay of female and male department heads. *See id.* ¶¶ 10–15. The Village disputes the relevance and materiality of those asserted disparities and notes that McCoy was not a department head. It does not dispute that she raised concerns about them. *See id.* ¶¶ 8–9. McCoy met with the Village's mayor in November or December 2022 and said that the Village paid men more than women for substantially similar work. *See id.* ¶ 15.

Whether pay disparities existed, and whether any disparity had a legally valid explanation, is not directly at issue except insofar as McCoy claims retaliation for raising equal pay concerns.[3] Her evidence concerning the asserted disparities may bear on whether she had an objectively reasonable basis for her complaint. *See* Fed. R. Evid. 401; *Rongere v. City of*

---

[3] The Village states that it conducted an HR study after McCoy's termination and implemented an employee compensation plan in 2024. Pl. Resp. to SMF ¶ 59 (undisputed).

*Rockford*, 99 F.4th 1095, 1104–05 (7th Cir. 2024); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 753–54 (7th Cir. 2002).

The Village's personnel manual addressed annual performance reviews, though the parties dispute whether it required them. *See* Def. Resp. to SMF ¶ 20; Personnel Manual 16, Pl. Ex. 8. The parties have not briefed the manual's interpretation, and their dispute over its meaning is not material at summary judgment. McCoy did not receive a formal performance review during her three years with the Village. *See* Def. Resp. to SMF ¶ 20.

In April 2022, the Village prepared a written personal development plan for McCoy. *See id.* ¶¶ 20, 22–25; Pl. Resp. to SMF ¶¶ 27–30. The parties agree that the plan was "intended to help [McCoy] grow," not to criticize her performance. Def. Resp. to SMF ¶ 23. It listed eight goals: (1) obtain certification as a health inspector; (2) conduct field reviews of commercial property for code compliance, including at least three half-days a week in the field and coordination with commercial building owners and the fire department on annual inspections; (3) maintain knowledge of current Community Development projects; (4) seek opportunities to attend community events; (5) attend weekly one-on-one meetings with the director; (6) respond to residents on code enforcement issues as needed; (7) review professional services contracts; and (8) manage and supervise staff operations and workloads. *See id.* ¶ 24 (undisputed characterization of plan, citing Pl. Ex. 17 at 11–12). Howard and Roberts prepared the plan and met with McCoy on April 14, 2022. *See id.* ¶¶ 23–25; Pl. Resp. to SMF ¶¶ 27–28. Burton also participated in the plan's preparation. Pl. Resp. to SMF ¶ 27.

Roberts met with McCoy about six months later, on November 10, 2022, to discuss her progress. *Id.* ¶ 29. Roberts followed up with a letter conveying his assessment of her progress toward the plan's goals. *Id.* ¶ 30 (citing letter from Roberts to Burton dated Nov. 10, 2022, Pl. Ex. 9). Roberts rated McCoy's field review for code compliance "satisfactory" but noted that "there has at times been questions as to [her] location on certain days." Letter from Roberts to Burton dated Nov. 10, 2022, at 3; *see also* Def. Resp. to SMF ¶ 26. The parties cite no other evidence describing Roberts's concerns and dispute whether Roberts, Howard, or Burton raised

them. *See* Pl. Resp. to SMF ¶ 30; Def. Resp. to SMF ¶ 26. They do not dispute that Roberts "was happy with plaintiff's performance" by December 2022. Def. Resp. to SMF ¶ 29 (citing Roberts Dep. 132:18–24, Dkt. No. 58-1).

**C. Village FMLA Policy**

The copy of the Village personnel manual in the record is dated 2001. It contains an FMLA policy but no ADA policy. Def. Resp. to SMF ¶¶ 5–6; *see also* Personnel Manual 1, 31–35. The FMLA policy provides in part:

> a) An employee requesting a family or medical leave must provide notice to the Village as soon as practicable on the form "Request for Family/Medical Leave" attached as Appendix A. Where the need for a leave is foreseeable, *e.g.*, for the birth of a child or planned medical treatment, the employee must provide 30 days notice. In the event the employee fails to provide 30 days notice for a foreseeable leave, the Village may delay the start of the employee's leave until 30 days after notice is provided.
>
> * * * * *
>
> **Medical Certification**
>
> a) In requesting a leave, an employee must provide sufficient facts to demonstrate that the leave qualifies under the FMLA.
>
> b) In the case of a request for medical leave, the employee must provide, within 15 days of the Village's request or as soon as reasonably possible, a medical certification, on the appropriate form "Physician or Practitioner Certification Employee–Serious Health Condition" or "Physician or Practitioner Certification Family Member–Serious Health Condition" attached as Appendix B and C, from the employee's health care provider that the leave is necessary because of his/her serious health condition or the need to care for a spouse, child or parent with a serious health condition.
>
> c) The Village, at its expense, may require a second opinion of a second health care provider. Should the second opinion conflict with the first, the Village may require a third opinion from a health care provider to be approved jointly by the employee and Village.
>
> d) An employee on leave may, at the Village's request, be required to report every 30 days on his/her status and intention to return to work an[d], in the case of a medical leave, provide periodic recertification by a health care provider.

> e) The Village may deny leave to employees who do not provide proper medical certification.
>
> **<u>Compensation and Benefits</u>**
>
> a) Family and Medical leaves granted under this policy are unpaid except that the employee must substitute any accrued paid vacation and/or sick leave for unpaid family and medical leave.

Personnel Policy Manual 33–34.

**D. McCoy's Requests and the Village's Responses**

McCoy began experiencing symptoms of a fibromyalgia flare-up in November 2022, affecting her sleep and ability to drive. Def. Resp. to SMF ¶ 37. "Beginning around November of 2022, Howard began tracking" McCoy's physical presence at Village Hall. *Id.* ¶ 34 (undisputed). Howard asked Gladys Foster, Burton's secretary, to review surveillance video of the employee entrance and deduct pay for any day McCoy did not enter the office and did not use paid time off. *Id.* Howard did not ask Roberts whether he had approved McCoy's working from home or whether she was working in the field. *Id.* In December 2022, McCoy "asked Howard for" a blank FMLA form in case she needed time to assist her daughter after her daughter gave birth. The record does not show that McCoy submitted a request for this purpose. *Id.* ¶ 35.

In February 2023, McCoy learned that her sister had been diagnosed with cancer. *Id.* ¶ 36. On or around March 10, 2023, McCoy submitted a form seeking intermittent FMLA leave to help care for her sister and take her to medical appointments. *Id.*; FMLA Request Form, Pl. Ex. 20, MATTESON 151–154, Dkt. No. 53-2. Howard denied the request by email on March 22, explaining that FMLA leave is available to care for a "spouse, son, daughter, or parent who have [sic] a serious health condition" but not a sibling. Pl. Resp. to SMF ¶ 33; Def. Ex. 12, Dkt. No. 57-9. McCoy does not challenge that denial here. *See* 29 U.S.C. § 2612(a)(1)(C).

On March 29, 2023, McCoy emailed Howard a letter from her doctor and requested permission to work from home. Def. Resp. to SMF ¶ 38. The doctor's letter, dated March 28, did not name McCoy's diagnosis. *See id.* It stated, in part, "Zatonya F. McCoy was evaluated in

clinic on 3/28/2023 and due to preexisting medical conditions patient needs resources to work from home. Please provide accommodations." Pl. Ex. 21, MATTESON 165, Dkt. No. 53-3. McCoy did not use the terms "ADA" or "reasonable accommodation" in her request. *See id.*

Howard responded on April 4, 2023, copying Burton. *See* Letter from D. Howard to Z. McCoy, Apr. 4, 2023, Pl. Ex. 22, MATTESON 171, Dkt. No. 53-3. His letter did not refer to the ADA by name. It quoted the doctor's request for "resources to work from home" and described what the Village considered McCoy's essential job functions, including attendance in person. *Id*. The letter stated in part:

> As Deputy Director of Community Development, you are responsible for overseeing the work in building inspections and codes, programs and services. You also plan and organize workloads for Building and Code Enforcement Inspectors, evaluate their progress and direct changes as needed. These responsibilities are considered an essential function to [sic] your position. Regular attendance and working from the office/ field are also essential functions for your particular position.
>
> FMLA does not require the employer to alter the basic working arrangement to provide accommodations such as working from home. It only requires the employer to provide 12 weeks of unpaid leave. As, [sic] the Village is not required to eliminate an essential function as a reasonable accommodation, the Village is denying your request.
>
> Within 24 hours of your receipt of this letter, you must contact me to discuss a plan for moving forward.

*Id.*

McCoy replied by email on April 5, 2023, at 6:27 p.m. *See* Pl. Ex. 23, MATTESON 199. She emphasized that she had requested remote work, not FMLA leave:

> In response to your letter, my HIPAA protected diagnosis is the reason for my need to work remotely, as working remotely has proven not to be any detriment to the Village.
>
> I have been working remotely without loss or shortage of production as it relates to my job functions you described in your letter.
>
> Fortunately, this is not a FMLA request and my physician and my immediate supervisor, Ernest R. Roberts III are both in agreement with the arranged accommodations.

> I have attached a copy of the letter from my doctor with her contact information and have attached a copy of your letter for reference.
>
> I would be open to discussion on this and all other matters with the attendance of Ernest R. Roberts III and/or with Keither Chambers, Deputy Village Administrator at your convenience.

*Id*.

McCoy asserts that Roberts had "autonomy and authority to make decisions regarding [McCoy]'s work." Def. Resp. to SMF ¶ 7. The Village agrees at that level of generality but disputes whether Roberts could approve full-time remote work as an ADA accommodation or make final decisions on FMLA leave. *See id.* McCoy does not dispute that Howard, as head of HR, reviewed and approved FMLA and ADA requests. Pl. Resp. to SMF ¶ 18. The record, including the personnel manual, does not clearly allocate formal decision-making authority over ADA accommodation requests. *See* Def. Resp. to SMF ¶¶ 5, 7–8; Pl. Resp. to SMF ¶ 18. The Village acknowledges that Roberts sometimes allowed his subordinates to work from home briefly. Def. Resp. to SMF ¶ 40. McCoy describes Roberts's approval of her remote work as lasting "until a decision would be made by HR regarding her request for accommodations." *Id.* ¶ 38. Roberts testified that he awaited HR's decision on McCoy's request. *See* Roberts Dep. 225:1–22, Dkt. No. 58-1; Def. Resp. to SMF ¶ 38. The cited evidence does not establish that Roberts had authority to override Howard's April 4 denial or that he tried to do so.

**E. Follow-up with McCoy's doctor and FMLA certification**

Howard telephoned McCoy's doctor on April 10, 2023. Def. Resp. to SMF ¶ 44. As discussed above, his testimony about the doctor's statements cannot be used to establish the truth of the doctor's assertions about McCoy's diagnosis or functional limitations. Howard then sent the doctor a copy of the job description for McCoy's position and a blank FMLA certification form. *Id.*; *see also* Pl. Ex. 24, MATTESON 184–90, Dkt. No. 53-3. The doctor returned a completed FMLA form on April 11. Def. Resp. to SMF ¶ 45; *see also* Pl. Ex. 24, MATTESON 191–95. The form provided alternative check boxes to indicate that an employee needed intermittent or continuous leave. *See* Pl. Ex. 24, MATTESON 193–94. The doctor

described a "chronic MSK [musculoskeletal] condition that can be exacerbated" and indicated an intermittent need for "time off for flares, follow up appointments," approximately one day every two months. *See id.* at MATTESON 193.

Howard emailed McCoy a letter dated April 17, 2023. Def. Resp. to SMF ¶ 46. It stated:

> The purpose of this letter is to inform you that I spoke with your doctor (Dr. Sirhan) on Monday April 10th regarding your condition. Your doctor states that you have a preexisting condition that would require you to be off work during flare-ups. I asked the doctor to complete the FMLA certification for you as a matter of record. Copy attached). [sic] Based on the FMLA certification, you qualify and will be granted intermittent FMLA leave during flare-ups of your condition. We will need to schedule a mutual day/ time to discuss the specific parameters pertaining to your leave.
>
> As indicated in my letter to you dated April 4, 2023, you are responsible for overseeing the work in building inspections and codes, programs and services. You also plan and organize workloads for Building and Code enforcement Inspectors, evaluate their progress and direct changes as needed. These responsibilities are considered an essential function to [sic] your position. Regular attendance and working from the office/field are also essential functions for your particular position. It's important to know that FMLA does not require the employer to alter the basic working arrangement to provide accommodations such as working from home. It only requires the employer to provide 12 weeks of unpaid leave. Therefore, your intermittent leave is granted on an unpaid status. You may use your earned PTO (vacation or sick) to provide income protection for the leave period.
>
> If you have any questions, please feel free to contact me.

Pl. Ex. 26, MATTESON 215, Dkt. No. 53-3.

Howard and McCoy held a one-on-one Zoom meeting on April 20, 2023. *See* Def. Resp. to SMF ¶ 47. McCoy told Howard that she "did not request FMLA leave." *Id.* (Village's characterization of an undisputed fact). She also said she wanted a third person, such as the mayor or deputy village administrator, present for discussions of her work from home request. *See id.* The meeting did not resolve the request.

**F. April 25, 2026, Meeting**

McCoy, Howard, and Roberts met by Zoom on April 25, 2023. *Id.* ¶ 48. The transcript appears to contain no remarks by Roberts. *See* Pl. Ex. 27 *passim*, Dkt. No. 53-3. Howard asked what the doctor meant by "resources to work from home" and sought to define the duration and parameters of McCoy's request. *See* Def. Resp. to SMF ¶ 48. McCoy said that she had a doctor's appointment scheduled for May 11, 2023. *Id.* She said she had been working from home, described the doctor's letter as a "doctor's order . . . to work from home," and said she performed all her job functions "except ride-alongs." Pl. Ex. 27, at MCCOY 141, 143. She also acknowledged that a flare-up was occurring. *See id.* MCCOY 143. When Howard raised the April 11 FMLA form, McCoy repeated her understanding that her doctor had ordered remote work. *See id.* MCCOY 144–45. The meeting concluded with Howard seeking more information about how long the flare-up would last and McCoy asking him to "send me what it is you want me to do and we'll go from there." *Id.* MCCOY 147.

On April 28, 2023, McCoy emailed Howard to ask why her paycheck was about $600 less than expected. *See* Pl. Ex. 31, at MATTESON 258; Def. Resp. to SMF ¶ 49. She said she had "been working continuously from home since March 29th per [her] doctor's orders." Pl. Ex. 31, MATTESON 258. Howard responded in part:

> As I've communicated to you in my Letters dated April 4 and April 17, 2023, FMLA does not require the employer to alter the basic working arrangements to provide accommodations. This includes working from home. Regular attendance and working from the office/field are essential functions for your position. FMLA is an unpaid period of time in which you must use your PTO (paid-time-off) in order to receive income protection. As of this pay period, we charged your PTO in which you had 39 hours of sick and 25 hours of vacation in your balances. The remaining 17 hours were leave without pay.

*Id.* at MATTESON 260. Howard and McCoy had no further communications about her request to work from home. *See* Def. Resp. to SMF ¶¶ 51–52. McCoy contends that Howard's April 28 email was the first express notice that he had placed her on unpaid leave retroactive to March 28. Def. Resp. to SMF ¶ 57. The Village disputes this characterization, pointing to the April 4, 17,

and 28, 2023, letters describing unpaid FMLA leave and substitution of accrued paid time off. *See id.* The Village did not pay McCoy after April 21, 2023. Def. Resp. to SMF ¶ 59; Pl. Resp. to SMF ¶¶ 48, 50, 52.

**G. Continued Requests, Unpaid Wages, and Disability Application.**

McCoy ceased most work around May 9, 2023, because she believed the Village would no longer pay her. Def. Resp. to SMF ¶ 60. She nevertheless continued to assist Roberts with some payroll matters and the Village's transition to new software. *See id.* McCoy saw her doctor around May 11. *Id.* ¶ 61. The doctor recommended that she remain out of the office and provided a note requesting continued remote work until her next appointment in July. *Id.*; Pl. Resp. to SMF ¶ 51 (undisputed fact; citations omitted). McCoy sent Howard the note, which resembled the March 28 letter, but he "did not reply." Def. Resp. to SMF ¶ 61. McCoy retained counsel, who demanded unpaid wages from the Village. *Id.* ¶ 62. Through counsel, the Village responded that it had not granted McCoy an ADA accommodation to work from home. *Id.* ¶ 64 (quoting Pl. Ex. 56). McCoy applied for short-term disability benefits in July 2023. *Id.* ¶ 66. The application was denied on the stated ground that she could perform her job's essential functions while working from home as an accommodation. *Id.* (undisputed). Although the Village does not dispute the denial, the cited record does not identify what information the decisionmaker considered or explain the reasoning. *See id.* The denial therefore has little apparent probative value on the contested essential functions issue.

**H. Termination**

In May 2023, Roberts emailed Howard about McCoy's upcoming medical appointment and said she might be cleared to return to work "Mid-July." Def. Resp. to SMF ¶ 67; Pl. Ex. 35, MATTESON 296, Dkt. No. 53-4. "Howard did not respond." Def. Resp. to SMF ¶ 67 (undisputed). Howard and Burton decided to terminate McCoy's employment in August 2023. Pl. Resp. to SMF ¶ 55 (undisputed). Howard sent McCoy a termination letter dated August 21, 2023. Def. Resp. to SMF ¶ 68. The letter recounted the history of McCoy's requests as the

Village understood them, beginning with a request predating her own March 2023 medical request: "On December 8, 2022, you requested FMLA for your daughter." Termination Letter, Pl. Ex. 36, MATTESON 426, Dkt. No. 53-4. Howard concluded:

> To date, you have failed to return to your position, submit adequate information, comply with Village requests, and perform your employment duties as the Deputy Director of Community Development. As such, I have determined that the conduct described above constitutes gross insubordination and just cause for the termination of your employment.

*Id.* at MATTESON 427.

McCoy filed a charge of discrimination with the Equal Employment Opportunity Commission, and this litigation followed. *See* Def. Resp. to SMF ¶ 72.

## III. Analysis

The parties' cross-motions for summary judgment present a set of factually and legally overlapping issues. Like the parties, the court analyzes McCoy's ADA and FMLA retaliation claims together in Part III.C below.

### A. ADA Failure to Accommodate

The ADA's stated purposes include "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To establish a failure-to-accommodate claim, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Schoper v. Bd. of Trs. of W. Ill. Univ.*, 119 F.4th 527, 536 (7th Cir. 2024) (citation modified) (quoting *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014)). The following genuine factual disputes must be resolved by a factfinder.

First, fact issues exist that are material to whether McCoy was disabled within the meaning of the ADA. The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–

(C). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); *accord* 29 C.F.R. § 1630.2(j)(1)(vii).

When it amended the ADA in 2008, Congress emphasized "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," while "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 888 (7th Cir. 2019) (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553, 3554).

It is undisputed that McCoy received a fibromyalgia diagnosis in 1998. Pl. Resp. to SMF ¶ 19. Depending on the limitations it imposes, the symptoms of fibromyalgia can constitute a qualified disability under the ADA. *See Feldman v. Olin Corp.*, 692 F.3d 748, 753–54 (7th Cir. 2012) (reversing denial of summary judgment on whether the plaintiff's fibromyalgia and sleep apnea symptoms qualified as an ADA disability). McCoy has come forward with enough admissible evidence, her own deposition testimony, to allow a factfinder to conclude that her fibromyalgia symptoms interfered with her ability to sleep and drive and that stress from being in the office exacerbated her symptoms. *See* Def. Resp. to SMF ¶ 37 (citing deposition testimony and other sources). The Village cites no contradictory evidence, though it characterizes McCoy's testimony as "self-serving," and argues about when it received notice of her symptoms. *See id.*

To the extent the Village raises objections to McCoy's testimony, those objections are overruled. The narrow doctrine precluding self-serving affidavits at summary judgment requires a conflict between a witness's earlier and later testimony; none is alleged here. *Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013); *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). As the Seventh Circuit has "repeatedly emphasized . . . , the term 'self-serving'

must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill*, 724 F.3d at 967 (citations omitted).

The Village maintains that the fact that McCoy did not identify her diagnosis by name in the doctor's letter or her meetings with Howard is fatal to her claims. *See* Def. Mem. Supp. Mot. Summ. J. 6–7, Dkt. No. 56-2. It asserts that McCoy failed to inform the Village "as to the exact nature of the claimed disability, what triggered the condition or flare-ups, and the amount of time(s) plaintiff would need resources to work from home," so Howard could not "evaluate her condition and a potential reasonable accommodation." *Id.* at 7. The ADA's text speaks not in terms of a doctor's diagnosis but rather in terms of the substantial "limitations" and "impairments" a "condition" imposes on a person's "major life activities." 42 U.S.C. § 12102(a)(1).

The Village's arguments concerning what Howard should have disclosed belong in the next step of the analysis concerning the interactive process the ADA requires and its breakdown. As the Seventh Circuit has explained, "An employee begins the accommodation process by notifying her employer of her disability," and "if an employee tells his employer that he has a disability, then the employer knows of the disability, and the ADA's further requirements [to engage in an interactive process] bind the employer." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) (quoting *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995)).

The Village relies heavily on the Seventh Circuit's decision in *Steffes v. Stepan Co.*, 144 F.3d 1070 (7th Cir.1998). The Seventh Circuit later distinguished *Steffes* in language that applies equally here: "We did not hold in *Steffes*, as the district court suggested, that an employee must make the employer 'aware of the full extent of [the employee's] disability' to trigger the interactive process." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005) (citation omitted). Viewed favorably to McCoy, her doctor's letter and email to Howard dated, respectively, March 28 and 29, 2023, met this standard. They identified a medical condition, albeit not by name, and requested an "accommodation" including working from home. *See* Pl.

Ex. 24, MATTESON 191–95. A reasonable factfinder could conclude that this and Howard's later communications sufficed to disclose her disability, request a specific accommodation, and trigger the employer's duty to engage in the interactive process. *See Spurling*, 739 F.3d at 1062; *Sears*, 417 F.3d at 804–05; *Hedberg*, 47 F.3d at 934.

But summary judgment for McCoy on this point is not warranted because fact disputes exist as to the extent of her limitations. *See Feldman*, 692 F.3d at 753–54 (extent of limitations imposed by fibromyalgia and sleep apnea presented fact questions for a jury). The Village emphasizes that, after Howard contacted McCoy's doctor on April 10, 2023, the doctor returned an FMLA form to the Village stating that McCoy required intermittent leave for flare- ups estimated as once every two months on average, and to attend doctor's appointments. *See* Pl. Ex. 24, MATTESON 193–94. A jury could credit the doctor's answers on this form as reflecting the extent of McCoy's functional limitations, but it would not be required to do so.

Viewed favorably to McCoy, the FMLA form dated April 11, 2023, could also be reasonably understood as expressing the doctor's views on the need for leave time in addition to a work from home accommodation. Moreover, it would be reasonable for a jury to credit the doctor's letters dated March 28 and May 11, 2023, rather than the April 11 FMLA form, as the most credible evidence that McCoy's limitations were such that she needed to work from home. In addition, McCoy stated in an email to Howard on April 10, 2023, that she was under "doctor's orders to work from home." Pl. Ex. 24, MATTESON 182. No objection has been made to this email message. *See* Def. Resp. to SMF ¶ 45. Because a reasonable factfinder could find for either party based on the foregoing evidence, the extent of McCoy's limitations caused by her medical condition raises genuine fact issues that must be resolved at trial.

Genuine fact disputes also preclude summary judgment for both parties concerning responsibility for the breakdown of the ADA interactive process. "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Sears*, 417 F.3d at 804 (citing *Bultemeyer v. Ft. Wayne Cmty. Schs.*,

100 F.3d 1281, 1285 (7th Cir. 1996)). The ADA "obligates an employer to engage in the interactive process precisely for the purpose of allowing both parties to act upon information instead of assumptions." *Id.* at 804–05.

Depending on how it finds the facts, a reasonable jury could fault McCoy or the Village for the breakdown in the interactive process. On the one hand, a jury could draw a negative inference from the Village's insistence that McCoy was making an FMLA leave request, despite her protestations the contrary. This could be seen as an attempt to recharacterize her request in order to avoid its duty to engage in the interactive process. *See, e.g.*, Def. Resp. to SMF ¶¶ 42–46. It is true that Howard repeatedly asked McCoy to clarify what she meant by requesting leave, but when viewed in a light favorable to McCoy, his requests for clarification were freestanding protestations that he did "not understand" what was being requested rather than a good faith effort to gather information on McCoy's functional limitations and disability in order to provide an accommodation. For example, nothing in the record suggests that Howard attempted to discuss McCoy's functional limitations when he called her doctor; rather, a jury could view his call as related to the FMLA rather than anything having to do with the ADA. *See id.* ¶¶ 44–46.

In *Sears*, "The employee's responsibility to provide additional information arose within the interactive process and after the employer had sought clarification of the nature of employee's disability and whether proposed accommodations would meet the employee's needs." *Sears*, 417 F.3d at 804. Here, a jury reasonably could find that Howard never proposed any accommodations at all and stonewalled. A jury disposed to reading the testimony and evidence in this way could therefore find that the Village did not engage in the interactive process. *See id.* at 804–05; *Spurling*, 739 F.3d at 1061–62.

Switching perspectives to view the evidence in the light most favorable to the Village, a factfinder could view McCoy as the primary cause of the interactive process breaking down. "[I]f [an] employee 'does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the

disabled employee.'" *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 821 (7th Cir. 2017) (quoting *Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014)). Taking the evidence favorably to the Village, attempts to solicit information about McCoy's disability could be interpreted as good-faith efforts to discharge the Village's ADA obligations. "When clarification is needed as to the nature of an employee's disability or the particular accommodation required, it is the employer's responsibility to solicit that information from the employee." *EEOC v. Wal-Mart Stores E., L.P.*, 113 F.4th 777, 787 (7th Cir. 2024) (citations omitted).

In the April 25, 2023, meeting with Howard, a jury seeing the facts the Village's way could view McCoy as "fencing" with Howard throughout the process and his attempts to gather more information about her condition and need for an accommodation. *See* Def. Resp. to SMF ¶¶ 48–49; Pl. Ex. 27, MCCOY 145–47 (transcript of the April 25, 2023, Zoom call). At times, when Howard asked for more information about the request, McCoy responded, "Just tell me what you want me to do." Pl. Ex. 27, MCCOY 145. A jury could conclude reasonably that Howard's responses amounted to a refusal to engage meaningfully in the exchange of information the interactive process requires. *See Wal-Mart*, 113 F.4th at 719.

In sum, a series of genuine factual disputes exist material to plaintiff McCoy's ADA failure to accommodate claim. Summary judgment on that claim is accordingly denied.

**B. FMLA Interference (Count IV)**

The FMLA entitles an eligible employee to "a total of 12 workweeks of leave during any 12-month period" for, among other reasons, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1), (a)(1)(D). Leave for an employee's own serious health condition may be taken "intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). An employer may require the employee to substitute accrued paid leave for FMLA leave. 29 U.S.C. § 2612(d)(2)(B). The FMLA also makes it "unlawful for any employer to interfere with, restrain,

or deny the exercise of or the attempt to exercise, any right provided under" the Act. 29 U.S.C. § 2615(a)(1).

To prevail on an FMLA interference claim, an employee must show that: (i) she was eligible for FMLA protections; (ii) her employer was covered by the FMLA; (iii) she was entitled to leave under the FMLA; (iv) she provided sufficient notice of her intent to take leave; and (v) her employer "interfered with, restrained, or denied FMLA benefits to which [s]he was entitled."[4] *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022); *see id.* at 1085. If the employee shows a violation, she must also "show prejudice, meaning harm resulting from the violation." *Id.* at 1085 (citing 29 U.S.C. § 2617(a); other citation omitted). Prejudice determines whether the statute provides relief for a violation; "[i]t does not set the threshold for what constitutes a violation of § 2615(a)(1) in the first place."[5] *Id.* at 1089 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

The Village moves for summary judgment on Count IV. It argues, in short, that McCoy received all of the FMLA leave to which she was entitled. Def. Mem. Supp. Mot. Summ. J. 11–14, Dkt. No. 56-2. Although the amended complaint pleads several theories of interference, *see* Am. Compl. ¶¶ 96–97, McCoy makes clear at summary judgment that she is pursuing one: that the Village interfered with her rights between March 28, 2023, and May 9, 2023, the date on

---

[4] The Village describes the fifth element as whether the employer "denied her FMLA benefits to which she was entitled." *Id.* at 12 (quoting *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014)). McCoy states the element the same way. *See* Dkt. No. 52 at 18–19; Dkt. No. 70 (both citing *Ziccarelli*, 35 F.4th at 1084–85). That formulation is narrower than the one the Seventh Circuit adopted in *Ziccarelli*. The court there observed that prior Seventh Circuit cases had "used varying language" for the fifth element of an FMLA interference claim and held that "interference with, or restraint of FMLA rights can violate § 2615(a)(1), without proof of an actual denial." *Ziccarelli*, 35 F.4th at 1085–87. It also stated that "[t]here have been variations in how to word the test for FMLA interference, but there is no genuine intra- or inter-circuit split on whether denial is essential and whether the requirement that plaintiff show prejudice precludes claims based on interference alone." *Id.* at 1087. The law was clarified, not changed. Both parties have briefed the substance of McCoy's theory, so the court evaluates Count IV under *Ziccarelli*'s formulation.

[5] Neither party addresses prejudice. Because prejudice governs relief rather than whether a violation occurred, *Ziccarelli*, 35 F.4th at 1088, the court expresses no view on it at this stage.

which she agrees she stopped performing regular work for the Village. She puts it this way: "The fact that Plaintiff did not report to work at all between May 9 and August 21, 2023 . . . does not negate Defendant's unlawful activity in placing her on an unpaid FMLA leave in March and April while accepting the benefit of her work." Pl. Mem. Opp. Mot. Summ. J. 14, Dkt. No. 61.

The Village's primary response is that it granted the intermittent leave McCoy's doctor certified and applied her accrued paid time to her absences as its policy and the FMLA allow. Def. Mem. Supp. Mot. Summ. J. 12–13 (citing *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 902 (7th Cir. 2018)). McCoy does not dispute that the application of paid time is permissible. Pl. Mem. Opp. Mot. Summ. J. 13. Her claim is narrower: that the Village counted time against her twelve weeks, and used up her paid time off, during weeks in which she was working, and did not tell her until April 28. *See* Def. Resp. to SMF ¶¶ 54–57.

The FMLA extends leave to an employee who is "unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). The Village's principal case recognizes that, "if [the employee] was fulfilling the requirements of her job, then she would not be entitled to FMLA leave." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 770 (7th Cir. 2008). The Village does not argue that an employer may count as leave time days during which an employee is doing her job. Its position is that McCoy was not doing her job during this period because the job required her to be in the office and she worked from home. Def. Mem. Supp. Mot. Summ. J. 12–14; Def. Reply Supp. Mot. Summ. J. 8–9, Dkt. No. 71. Unlike in *Ridings*, 537 F.3d at 770, where it was inferred and apparently not contested that working on-premises was an essential function, here there are factual disputes material to whether working on-premises was an essential function of McCoy's job between March 28 and May 9, 2023.

Taking the evidence favorably to McCoy, a jury could find that her department head, Roberts, approved and directed her to work from home; that contrary to Howard's position, Roberts believed McCoy could perform her job effectively while working from home; that McCoy worked full time until May 9; and that the Village knew, through Roberts and through McCoy's emails to Howard claiming to be working full time, that she was performing full time

work. *See* Def. Resp. to SMF ¶¶ 38, 54, 56. On the other hand, the Village points to evidence from which a jury could determine that Roberts had no authority to approve remote work and that he deferred to HR. *See* Pl. Resp. to SMF ¶ 54. Whether in-person attendance was an essential function of McCoy's position is itself a question of fact. *See Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022).

The Seventh Circuit has explained the role of an employer's judgment in the essential functions analysis this way: "The employer's judgment is a factor, and an important one, but it is not necessarily decisive. Our cases have often noted that some degree of deference is appropriate, but an employer's stated judgments about which functions are essential may or may not be consistent with the job as actually performed, or perhaps even as set forth in written job descriptions." *See id.* (citing *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 634 (7th Cir. 2020)). Thus, while the Village's views on essential functions carry significant weight, they are not decisive and must be weighed against other evidence to make a factual determination about what the job's essential functions were. *See id.*

If a jury credited McCoy's account, it could find that the Village accepted her work while treating her as on leave, and that it did not inform her that it was doing so until April 28, 2023. Under *Ziccarelli*'s formulation, this conduct, if credited by a jury, restrained her use of the leave the FMLA gives her, even though the Village never refused her any leave. *Ziccarelli*, 35 F.4th at 1085–87; *cf. Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 658 (7th Cir. 2024) ("Interference would exist if, despite nominally granting her request for FMLA leave, it deprived her of the benefits of that leave."); *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008) (a reasonable jury could find that FMLA leave granted was "illusory"). The parties also dispute how many hours McCoy worked between March 28 and May 9, 2023. *Compare* Def. Resp. to SMF ¶ 54, *with* Pl. Resp. to SMF ¶ 56. Those disputes preclude summary judgment for either side on Count IV.

**C. ADA and FMLA Retaliation (Counts II and V)**

Counts II and V allege that the Village fired McCoy in retaliation for engaging in protected activity under the ADA and the FMLA. These claims "share the same basic framework." *Shirk v. Trs. of Ind. Univ.*, 167 F.4th 460, 467 (7th Cir. 2026). Each requires proof that "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Id.* (quoting *Freelain*, 888 F.3d at 901). The Village does not dispute, and the summary judgment record supports these findings, that McCoy engaged in protected activity and that her termination was an adverse action. Def. Mem. Supp. Mot. Summ. J. 14. The Village contends that McCoy must show her protected activity was "a substantial or motivating factor" in the decision, *id.* (citing *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022)), and the court applies that standard.[6] As in *Shirk*, the claims turn on causation. *Shirk*, 167 F.4th at 467.

On a retaliation claim, a plaintiff may prove causation with direct or circumstantial evidence, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Kedas v. Ill. Dep't of Transp.*, 149 F.4th 951, 958 (7th Cir. 2025) (quotation omitted). The court considers the record as a whole and does not sort evidence into "direct" and "indirect" categories. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). McCoy relies principally on the termination letter dated August 21, 2023, to support her retaliation claims. Pl. Mem. Opp. Mot. Summ. J. 16–17.

---

[6] The parties have not briefed the causation standard in depth. The Village cites *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022), for the proposition that McCoy must show that her protected activity was "a substantial or motivating factor" in the decision to terminate her. Def. Mem. Supp. Mot. Summ. J. 14. More recent Seventh Circuit decisions recite a but-for causation standard. *See, e.g.*, *Lohmeier v. Gottlieb Mem'l Hosp.*, 147 F.4th 817, 830 (7th Cir. 2025) (FMLA); *see also Kedas v. Ill. Dep't of Transp.*, 149 F.4th 951, 958 (7th Cir. 2025). The Seventh Circuit has observed that its FMLA decisions "have not been fully consistent" on the point. *Chitwood v. Ascension Health All.*, 168 F.4th 493, 798 n.2 (7th Cir. 2026). But-for causation does not mean sole causation: "[A] single event can have multiple but-for causes." *Shirk*, 167 F.4th at 467 (quoting *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014)). The court need not choose between these causation standards because the Village invokes the less demanding causation standard. The result would not change under a but-for causation standard.

**1. FMLA (Count V).**

The termination letter, signed by Howard, states that "there have been ongoing issues with your employment which contributed to the decision to terminate your employment," and it lists first among them, "On December 8, 2022, you requested FMLA for your daughter." Def. Resp. to SMF ¶ 68 (undisputed). Eight more items, arranged chronologically, follow. Each concerns McCoy's March 29, 2023, request to work from home and the Village's subsequent correspondence with her and her doctor. *See id.*; Pl. Ex. 36, MATTESON 426–27, Dkt. No. 53-4 (Termination Letter). The letter concludes that McCoy "failed to return to [her] position, submit adequate information, comply with Village requests, and perform [her] employment duties," which Howard characterized as "gross insubordination." Pl. Ex. 36, MATTESON 426. The Village responds that the December 2022 entry noting that McCoy requested FMLA leave for her daughter (but did not take it) should be viewed as background "time-line and context," notes that it approved McCoy's December 2022 leave request, and adds that McCoy never used it. Def. Resp. Opp. Mot. Summ. J. 9–10.

A reasonable jury could interpret the termination as the Village does, but it could also read the letter as McCoy does: a statement of what contributed to or caused the Village to find her to be insubordinate and fire her. The court may not choose between reasonable readings of a letter at summary judgment. That prerogative belongs to a jury. *See Ortiz*, 834 F.3d at 765. Howard wrote the letter, and the Village asserts (there is no dispute) that he and Anthony Burton, the Village Administrator, made the decision to terminate McCoy. Pl. Resp. to SMF ¶ 55.

The fact that the decisionmaker wrote the termination letter listing an FMLA leave request among the reasons for termination distinguishes *Shirk*, on which the Village relies. The *Shirk* plaintiff relied on isolated remarks of a speaker who, the record showed, played no part in the decision to terminate the plaintiff, and "nothing suggest[ed] that either of [the two individuals]" who did decide "had [the plaintiff's] protected activity in mind." *Shirk*, 167 F.4th at 468. Here one of the decisionmakers wrote that McCoy's FMLA request was among the issues that "contributed to the decision to terminate her." Pl. Ex. 36, MATTESON 426.

Other undisputed facts bear on how a jury might read the letter. Howard did not consult McCoy's supervisor, Ernest Roberts, who testified that he "would have been happy for McCoy to return to work." Def. Resp. to SMF ¶ 70. Also, Howard undisputedly did not respond when Roberts reported to him that McCoy might be cleared by her doctor to return to work by mid-July. *Id.* ¶ 67. And apart from a June exchange about her employment status and a July 19 request for help with a disability application, Howard did not communicate with McCoy after April 28, 2023. *Id.* ¶ 65. From the termination letter and these facts together, a reasonable jury could find that McCoy's December 2022 FMLA request was among the Village's reasons for her termination. The letter's additional, legitimate grounds do not foreclose that finding because an employer may act for more than one reason and violate the FMLA. *Cf. Shirk*, 167 F.4th at 467 ("[A] single event can have multiple but-for causes.") (quoting *Hospira*, 762 F.3d at 562 n.3).

For these reasons, summary judgment is denied on Count V.

**2. ADA (Count II).**

McCoy's ADA retaliation claim rests on her March 29, 2023, request for accommodation and her continued pursuit of it. The Village does not develop an argument that the request was not protected activity, and the court does not decide the issue. *See* Def. Mem. Supp. Mot. Summ. J. 14–15. Causation is again the question.

The Village asserts that Howard fired McCoy because she "failed to return to [her] position, submit adequate information, comply with Village requests, and perform [her] employment duties." Def. Resp. to SMF ¶ 68. It maintains that Howard honestly believed she had refused to return to in-person work. It points to Howard's letters dated April 4, April 17, and April 28, 2023, which stated that McCoy's position required in-person attendance, and to McCoy's offer to meet by Zoom and her failure to return to the office. *See* Def. Mem. Supp. Mot. Summ. J. 14–15; Def. Reply Supp. Mot. Summ. J. 2–3; Pl. Resp. to SMF ¶¶ 36, 40–47, 56. An employer's honest belief in its stated reason defeats an inference of pretext even if the belief was mistaken. *See Brooks v. Avancez*, 39 F.4th 424, 435–36 (7th Cir. 2022) (citations omitted).

McCoy responds that on this record a reasonable jury could disbelieve the Village's stated reason for terminating her employment. The court's assessment of the record bears out this argument. It is undisputed that Howard did not ask McCoy, before he fired her, whether she could return to work, despite having been told by Roberts that she might have been cleared to do so in mid-July 2023. *See* Def. Resp. to SMF ¶ 69. Roberts testified that he would have welcomed McCoy's return if she had been permitted to do so, but it is undisputed that Howard did not consult him. *See id.* ¶¶ 67, 70 (objection to self-serving testimony is overruled, *see supra* Part II.B). For nearly four months before McCoy's August 21, 2023, termination, Howard's only communications with McCoy consisted of brief email exchanges in June and July described above. *See id.* ¶ 65.

The termination letter also lists McCoy's March 29 request, the second entry after the December 2022 FMLA request, among the "issues" that "contributed to the Village's termination decision." *Id.* ¶ 68; Pl. Ex. 36, MATTESON 426. Viewed favorably to McCoy, a reasonable jury could determine that a decisionmaker said in so many words that McCoy's request for a work from home accommodation contributed to the decision to fire her. *See id.* From these facts a reasonable jury could find that Howard did not honestly believe McCoy had refused to return to work and that the Village decided to terminate her because she continued to seek an accommodation. On the other hand, a jury would also be entitled to credit the Village's account of the termination letter and its reasons for its termination decision. The choice between these two versions of the facts belongs to the jury. Summary judgment is denied on Count II.

**D. Retaliation for Compensation Complaints (Count III)**

Count III alleges that the Village retaliated against McCoy, in violation of Title VII and the Equal Pay Act, because she complained that female department heads were being paid less than male department heads. *See* Am. Compl. ¶¶ 80–84, Dkt. No. 15. Retaliation claims under both statutes follow the same framework. *Rongere*, 99 F.4th at 1104 (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)). To prevail, McCoy must show that she engaged in

protected activity, that she suffered an adverse action, and that the protected activity caused the adverse action. *Id.* Unlike the ADA and FMLA claims above, this claim requires but-for causation: McCoy must show that the adverse action would not have occurred without her complaints. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The Village first argues that McCoy lacked an objectively reasonable belief that the Village was violating the law, that it was paying men and women unequally, and that she therefore did not engage in protected activity. Def. Mem. Supp. Mot. Summ. J. 16–17 (citing *Ryan Int'l*, 305 F.3d at 752–53). The court need not resolve that dispute or decide which of the actions McCoy identifies would count as materially adverse. The court will assume solely for the sake of argument that McCoy's complaints about equal pay constituted protected activity and that the employment actions she challenges constituted adverse actions.[7] As explained below, these claims nevertheless fail for want of evidence creating a fact issue on causation.

McCoy identifies five adverse actions: her termination, denial of merit raises during her three years working for the Village, the April 2022 performance development plan, Howard's tracking of her whereabouts beginning in or around November 2022, and, in her cross-motion, her placement in unpaid leave status beginning March 29, 2023.[8] *See* Pl. Mem. Supp. Mot. Summ. J. 16, Dkt. No. 52.

---

[7] *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), lowered the bar for adverse action on a discrimination claim under 42 U.S.C. § 2000e-2(a)(1), but *Muldrow* did not address the "materially adverse action" standard for retaliation claims under § 2000e-3(a). The court does not reach that issue today.

[8] The amended complaint also pleads two additional adverse actions, namely, that the Village removed McCoy from weekly meetings and that it excluded her from a leadership training opportunity. Am. Compl. ¶¶ 36, 84. The Village moved for summary judgment on those claims, Def. Mem. Supp. Mot. Summ. J. 16, and McCoy's response does not defend them. She has not preserved them. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). By contrast, the amended complaint does not plead as adverse actions the April 2022 personal development plan or the Village's tracking of McCoy's attendance. *See Am. Compl.* ¶¶ 80–84. The Village does not object that those theories of adverse action were unpleaded or that it was surprised by them, and it has responded to them on their merits. *See* Def. Mem. Opp. Mot. Summ. J. 12–13, Dkt. No. 65. The court therefore considers these unpleaded adverse actions advanced by McCoy in her briefing.

The record contains no evidence causally linking those actions to McCoy's complaints about pay disparities between men and women. In her briefing, McCoy suggests that the mayor and Burton became frustrated with her complaints and contrived a scheme to retaliate against her, but she cites no evidence lending support to her theories. *See id.* at 16–17. Unsupported speculation about what an employer or their agents might have said or done does not, without more, carry a plaintiff's summary judgment burden in this context. *See Johnson v. Accenture LLP*, 142 F.4th 536, 544 (7th Cir. 2025) (rejecting a retaliation theory that a manager "must have worked behind the scenes" because "[s]peculation is not enough to survive summary judgment") (citing *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021)); *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

McCoy's theory that her equal pay complaints caused her termination depends on a chain of speculative inferences. It is undisputed that McCoy met with the mayor about pay disparities in November or December 2022. Pl. Resp. to SMF ¶ 15. McCoy posits, without supporting evidence, that the mayor then spoke with Burton, that Burton and Howard grew frustrated with her, that their frustration led them to deny her accommodation, and that the denial led to her termination. Pl. Mem. Supp. Mot. Summ. J. 16–17. No record evidence supports a finding that the mayor spoke with Burton about McCoy's complaints. While one might conclude from their exchanges that there was personal and professional tension among McCoy, Howard, and Burton, no evidence has been cited permitting the inference that Howard or Burton's animus toward McCoy was related to McCoy's equal pay complaints or that either acted on any such animus in deciding how to respond to McCoy's work from home request in March and April 2023 or in deciding to fire her in August.

A jury could draw the first inference in this speculative chain—that the mayor spoke with Burton—only by supposing that it happened, and each subsequent link only by supposing that the one before it did. Such a chain amounts to unsupported conjecture of the kind that does not stave off summary judgment. *See Johnson*, 142 F.4th at 544; *Herzog*, 742 F.3d at 806. As for

the lapse of time between protected activity and adverse action, the events McCoy challenges began in March 2023, three or four months after she met with the mayor, and McCoy's termination occurred eight or nine months after her meeting with the Village mayor. "[T]iming alone is 'rarely sufficient' to show causation," *Johnson*, 142 F.4th at 543 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)), and it is insufficient here, where the only other possibility comes from the chain of speculative inferences described above. The termination letter does not reference equal pay complaints. *See* Def. Resp. to SMF ¶ 68. McCoy's opposition brief reflects the speculative gap in the evidence when it argues only that her "[complaints] about unequal pay . . . could have contributed" to her termination. Pl. Mem. Opp. Mot. Summ. J. 16.

McCoy's other claimed adverse actions fare no better on causation. McCoy's personal development plan was created in April 2022, after Howard and Burton told McCoy's supervisor they were concerned about her attendance, Def. Resp. to SMF ¶ 22 (undisputed), and the Village began tracking McCoy's office attendance in November or December 2022. *Id.* ¶ 34. McCoy points to nothing but the timing and sequence of these events to support a causal connection to her voicing concerns about unequal pay. McCoy notes that two other female deputy directors received raises in May 2022 and that nothing suggests they complained. *See id.* ¶¶ 11–12. But McCoy's statement of facts attributes the two comparators' higher salaries to longer service. *See id.* ¶ 11. The Village responds that, despite their titles, both comparators headed a department but McCoy did not. *See id.* ¶¶ 11–12. McCoy does not dispute this. *See id.* She also cites no evidence showing who decided which employees would receive raises, and no evidence indicating whether the decisionmaker(s) knew of her complaints. Without this sort of additional evidence, the bare fact that McCoy did not receive a merit-based raise does not permit a finding that her complaints about unequal pay caused it to happen.

For these reasons, the Village's motion for summary judgment on Count III is granted, and McCoy's cross-motion is denied as to that count.

**E. Wage Claims (Counts VI and VII)**

In Counts VI and VII, McCoy alleges that the Village did not pay her for work she performed from home between March 29 and May 8, 2023, in violation of the IWPCA, 820 Ill. Comp. Stat. 115/1 *et seq.*, and the IMWL, 820 Ill. Comp. Stat.105/1 *et seq.* Am. Compl. ¶¶ 108–126. Both parties move for summary judgment on both counts.

The Village argues that McCoy left Village Hall on March 29, never returned despite the Village's requirement of in-person attendance, and was therefore absent rather than working; that it treated her absences as leave, first charging her accrued sick and vacation time and later recording unpaid leave; and that she has identified no agreement, separate from her employment, on which an IWPCA claim could rest. *See* Def. Mem. Supp. Mot. Summ. J. 18–19; Def. Resp. Opp. Mot. Summ. J. 15–17, Dkt. No. 65; Def. Reply Supp. Mot. Summ. J. 10–11, Dkt. No. 71. McCoy argues that her supervisor, Roberts, permitted her to work from home while the Village decided her accommodation request, that she worked full time, and that the Village paid her nothing for that work apart from charging her accrued leave. Pl. Mem. Supp. Mot. Summ. J. 6–9; Pl. Resp. Opp. Mot. Summ. J. 18–20.

The record raises genuine disputes of material fact as to both counts, so the court denies summary judgment.

**<u>1. The IWPCA's Agreement Requirement</u>**

The IWPCA provides an employee a cause of action against an employer for the timely and complete payment of earned wages. *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). It defines "wages" as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties." 820 Ill. Comp. Stat. 115/2; *see Enger*, 812 F.3d at 568. Because the statute "provides no substantive relief beyond what the underlying employment contract requires," *Enger*, 812 F.3d at 570, a plaintiff must show that her employer owed her the compensation under an agreement between them, *id.* at 568–69.

The Village argues that McCoy has not identified "a separate contract or agreement" on which her IWPCA claim rests. Def. Mem. Supp. Mot. Summ. J. 19 (quoting *House v. Ill. Bell Tel. Co.*, 148 F. Supp. 3d 701, 705 (N.D. Ill. 2015)). Contrary to the Village's implication, *Enger* imposes no requirement of an agreement apart from the employment relationship. The court in *Enger* assumed that "the parties' relationship [was] governed by an implicit employment contract," 812 F.3d at 569, and rejected the plaintiffs' IWPCA claims (they were a class of drivers) because the parties' agreement "did not obligate [the employer] to compensate the drivers" at all. *Id.* In contrast, there is no dispute here that the parties' employment agreement obligated the Village to pay McCoy.

The Village admits that it agreed to pay her a salary "in exchange for completing the job duties assigned to her," Def. Resp. to SMF ¶ 2, and that it paid her biweekly on a prorated hourly basis, *id.* ¶ 53. That salary agreement satisfies the IWPCA's requirement to show an agreement to pay wages. Whether the Village owed McCoy compensation under that agreement for the pay periods at issue is the question discussed in Part 2 below, which the parties' briefs present in substantially the same terms under both statutes.

**<u>2. Whether the Village Owed McCoy Pay for March 27 Through May 8, 2023</u>**

Both wage and hour counts depend on two factual questions: how many hours McCoy worked between March 28 and May 9, 2023, and whether the Village suffered or permitted her to work those hours. The Village's response to both questions rests in part on its treatment of McCoy's time as FMLA leave. The Village's human resources director, Dewayne Howard, directed that McCoy's accrued sick time be drawn down for each workday beginning March 29, 2023. Pl. Resp. to SMF ¶ 37. In his April 28 email to McCoy, Howard explained that the Village had charged her sick and vacation time and recorded the remaining seventeen hours in the relevant pay period as leave without pay. Def. Resp. to SMF ¶ 50. The Village recorded her time from April 22 through at least June 2 as leave without pay. Pl. Resp. to SMF ¶¶ 48, 50, 52. McCoy admits that the Village recorded her time this way but disputes that she was on FMLA

leave, contending that she worked full time from home throughout. *Id.* ¶¶ 44, 48. The Village's characterization of a day as leave does not establish that McCoy did no work that day or that the Village did not permit any work she performed, and so the Village's recording of leave does not resolve either factual question.

The IMWL and the IWPCA both define "employee" to include an individual "permitted to work by an employer." 820 Ill. Comp. Stat. 105/3(d); 820 Ill. Comp. Stat. 115/2. The FLSA defines "employ" to include "to suffer or permit to work." 29 U.S.C. § 203(g). Where an IMWL provision is parallel to the Fair Labor Standards Act ("FLSA"), Illinois courts treat federal authority interpreting the FLSA as persuasive. *Johnson v. Amazon.com Servs., LLC*, 2026 IL 132016, ¶ 20 (citing *Mercado v. S&C Elec. Co.*, 2025 IL 129526, ¶ 33); *see also* 56 Ill. Admin. Code 210.120. Neither party here has identified a difference between the FLSA and the Illinois statutes bearing on whether an employer permitted an employee to work. Both parties brief that question under FLSA principles, and neither contends that a different standard governs McCoy's IWPCA claim. The court therefore applies the FLSA principles that both parties invoke.

Under those principles, an employer must pay for work it knew or had reason to know about. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (an employee must show "actual or constructive knowledge" of the work, and the FLSA "stops short of requiring the employer to pay for work it did not know about, and had no reason to know about"). An employer that does not want work performed must "exercise its control and see that the work is not performed," and it "cannot sit back and accept the benefits without compensating for them." *Id.* (quoting 29 C.F.R. § 785.13). "The mere promulgation of a rule against overtime work is not enough." *Id.* The Village's argument that an employee may not "unilaterally decide where and when she wants to perform her work and therefore obligate the employer to pay," Def. Resp. Opp. Mot. Summ. J. 16–17, therefore does not defeat McCoy's claims.

The Village's in-person requirement is relevant to, but not dispositive of, whether the Village knew or had reason to know that McCoy was working from home and whether it permitted her to work. In *Kellar*, the court affirmed summary judgment for the employer

because the plaintiff, a manager responsible for enforcing the overtime policy, never told the owners that she was working before her shift, and nothing in the record suggested that they knew. *Kellar*, 664 F.3d at 177–78.

The record on the Village's knowledge and permission raises genuine disputes of material fact. First and foremost, McCoy told Howard in her email dated April 5, 2026, that she was continuing to work: "I have been working remotely without loss or shortage of production as it relates to my job functions you described in your letter." Pl. Ex. 23, MATTESON 199. It is also undisputed that Roberts permitted McCoy to work from home "as needed" for her condition until Human Resources responded to her request to be permitted to work from home, according to the Village's own account of his testimony. Def. Resp. to SMF ¶ 38. McCoy contends that Roberts also expected her to work full time during that period, *i.e.*, the month of April and early May 2023, and that he believed that she was doing so, Pl. Mem. Supp. Mot. Summ. J. 6; Pl. Reply Supp. Mot. Summ. J. 12, Dkt. No. 70. The Village disputes that the cited testimony supports that contention.

Having examined Roberts' deposition testimony, his testimony supports the plaintiff's contention. *See* Def. Resp. to SMF ¶¶ 49, 54 (citing Roberts Dep. at 147–169). McCoy also relies on Howard's testimony that he confirmed that she had been working from home and did not correct her leave record. Pl. Resp. to SMF ¶ 44 (citing Howard Dep. 142:10–143:2). The Village responds that Roberts lacked authority to approve an accommodation or FMLA leave, Def. Resp. Opp. Mot. Summ. J. 17; Pl. Resp. to SMF ¶ 18 (disputing that Roberts lacked authority), and that its letters told McCoy that working from home was not approved, Def. Resp. to SMF ¶ 56.

Regardless of how this dispute is resolved, Roberts's asserted lack of authority to grant an accommodation does not address whether the Village, through the supervisor who assigned McCoy's daily work, knew or should have known that she was in fact working. The Village does not suggest that Roberts's knowledge cannot be attributed to it under basic agency principles, and Roberts's knowledge will therefore be attributed to the Village at summary judgment. With

that attribution, fact issues exist concerning whether the Village, through Roberts, knew or should have known that McCoy was working between March 28 and May 9, 2023.

The parties also disagree about how many hours McCoy worked and which party bears the burden of proof on that issue. The Village argues that McCoy has no contemporaneous journals, recordings, or other documents reflecting the time she worked. Def. Resp. Opp. Mot. Summ. J. 16; Def. Reply Supp. Mot. Summ. J. 11. McCoy responds by invoking the burden-shifting framework described in *Melton v. Tippecanoe County*, 838 F.3d 814 (7th Cir. 2016).

Under that framework, an employee whose employer kept inaccurate or inadequate records "has carried out [her] burden if [she] proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 818 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687–88).

The Village argues that *Melton* is distinguishable because it was an overtime case in which most of the plaintiff's hours were documented. Def. Resp. Opp. Mot. Summ. J. 16. That distinction does not change the burden-shifting rule *Melton* applies, which rests on the employer's statutory obligation to keep records of hours worked. *See Melton*, 838 F.3d at 818. McCoy did not clock in or track her hours, Def. Resp. to SMF ¶ 16, and the Village monitored only whether she was physically present at Village Hall, *id.* ¶ 34. *Melton* also does not require contemporaneous records. The plaintiff in *Melton* lost part of his claim because his own spreadsheet of hours worked was implausible on its face, not because he lacked a contemporaneous record. *Melton*, 838 F.3d at 819–20. McCoy's testimony of her hours worked suffices to carry her initial burden under *Melton*, and the Village's characterization of McCoy's testimony as "self-serving" does not render it inadmissible. *See Kellar*, 664 F.3d at 175

("[E]vidence presented in a 'self-serving' affidavit or deposition is enough to thwart a summary judgment motion").

Applying the *Melton* framework, McCoy's testimony, together with her emails and text messages with Roberts and others and the deposition testimony described above, would permit a jury to infer that she worked the hours listed in the chart in her LR 56.1 fact statement. *See* Def. Resp. to SMF ¶¶ 54–55. The Village has produced evidence that would permit a jury to reject that inference in whole or in part, however. The parties agree that McCoy posted an automatic reply on or about May 3, 2023. The automatic reply stated that she would be out of the office until May 15. Pl. Resp. to SMF ¶ 49. A jury could reasonably infer from the automatic reply that she was not attending to her duties on a full time basis after the posting date, depending on how it weighed the evidence. A jury could also reasonably infer that McCoy continued to work while discouraging interruptions, particularly because the parties agree that she assisted with payroll on May 8. Def. Resp. to SMF ¶ 60.

The Village also disputes that the emails and texts McCoy cites show full time work, contending that the emails she received were not directed to her and that the record of text messages she has submitted shows she completed a single task for Roberts on May 8. *See id.* ¶¶ 54–55, 60. These arguments concern the weight to be given the evidence and what inferences should be drawn from it about the number of hours McCoy worked. The court may not weigh the evidence at summary judgment.

The record therefore leaves the following matters for trial. On Count VI, the jury must determine, for each pay period from March 28 through May 9, 2023, how many hours McCoy performed the duties of her position, whether the Village permitted her to perform them, and what the Village paid her for those hours. On Count VII, the jury must determine the same facts and, for any hours it finds McCoy worked with the Village's permission, whether the wages the Village paid her for them amounted to less than the minimum hourly wage of $13 that applied in

2023.[9] 820 Ill. Comp. Stat. 105/4(a)(1). Summary judgment is denied to both parties on Counts VI and VII.

## IV. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment, Dkt. No. 51, is denied, and defendant's cross motion for summary judgment, Dkt. No. 56, is granted in part and denied in part. Consistent with this opinion, Count III of the amended complaint, Dkt. No. 15, is dismissed. The parties' cross motions for summary judgment are, in all other respects, denied. The parties are directed to file a joint status report informing the court of how they intend to proceed. The parties' joint status report is due by and including October 15, 2026.

Date: October 1, 2026

/s/ Joan B. Gottschall
United States District Judge

[9] The parties dispute whether the sick and vacation time the Village charged to these pay periods counts as compensation for the hours McCoy claims to have worked. *See* Pl. Mem. Supp. Mot. Summ. J. 8 n.3; Def. Reply Supp. Mot. Summ. J. 10–11. That dispute matters only if a jury finds that McCoy worked hours that the Village recorded as leave. The court therefore does not resolve this issue at summary judgment.